J-A03004-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JESSE LEE BLACKBURN | : | |
| | : | |
| Appellant | : | No. 549 WDA 2023 |

Appeal from the Judgment of Sentence Entered April 17, 2023
In the Court of Common Pleas of Fayette County Criminal Division at
No(s): CP-26-SA-0000090-2022

BEFORE: BOWES, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.:                    **FILED: April 4, 2024**

Jesse Lee Blackburn appeals *pro se* from the judgment of sentence of fines and costs following his conviction for disorderly conduct.[1] Upon review, we affirm.

We glean the following from the certified record. On July 16, 2022, numerous police agencies, including the Pennsylvania State Police ("PSP") and their special emergency response team, collaborated to investigate a shooting in Uniontown City. At all relevant times, the shooter remained barricaded in a house. PSP troopers assisted the local police department in establishing an outer perimeter for safety, which included an area for members of the media.

---

[1] Since Appellant was charged with summary offenses punishable at most by fines and costs, he was not entitled to counsel under either the Pennsylvania or United States constitutions. *See **Commonwealth v. Smith***, 868 A.2d 1253, 1256 (Pa.Super. 2005). Except for the trial *de novo* where he retained counsel, Appellant has proceeded *pro se* in this matter.

The inner perimeter contained a special PSP box truck that was utilized as a command post for managing the scene. The command post itself was situated in a shopping center parking lot next to a fire station. Police and emergency medical personnel parked their vehicles in the lot, keeping them unlocked for easy access to equipment and weapons as the investigation unfolded. Additionally, they set up a staging area in the alley adjacent to the lot for drone helicopters.

Notably, the house where the shooting occurred, the command center parking lot, and other areas blocked from public access were all on one side of the street, while pedestrians and the media were permitted to observe from the opposing sidewalk. Caution tape identified some portions of the perimeter, such as at the entry to the street of the crime scene, around certain locations within the outer perimeter where observers had been converging, and across the alley adjacent to the command center lot. However, due to the fluid nature of the situation, the responding agencies chose not to rely primarily on caution tape to denote the perimeter. Instead, they barricaded the streets with emergency vehicles to prevent vehicular traffic into the outer perimeter. They also parked several clearly marked police vehicles along the sidewalk that abutted the command center parking lot, creating a visual division between the opposing sides of the street. Finally, officers patrolled the inner perimeter to advise pedestrians to stay out of the command post parking lot. In this way, they were able to utilize the entire street and the parking lot as a staging area for their investigation.

The police permitted a limited civilian presence within the command center parking lot. Specifically, one pedestrian was permitted, while under police visual surveillance, to walk on the sidewalk adjacent to the lot in order to reach his nearby home. Another individual was granted entry into the lot so that he could unlock one of the shopping establishments for the emergency personnel to have access to restroom facilities. Finally, three individuals involved in the shooting were stationed within the lot, namely, the shooter's father, the victim, and the victim's aunt ("the witnesses"). Otherwise, civilians were excluded from the lot.

During this active investigation, Appellant, who operates a web-based news page called the Fayette Exposure, began to film the scene on his phone. He started near the house where the shooting had occurred from a vantage point on the opposite side of the street, where other observers could be seen and heard.[2] However, Appellant then walked a couple blocks to where a battering ram truck was being outfitted, crossed the street to enter the command center parking lot, and approached the witnesses. Despite being told by four officers to leave the parking lot and return to the opposing sidewalk where pedestrians and the press were permitted to observe, Appellant refused, invoking his First-Amendment right to be there. After the

_____

[2] Appellant describes his webpage as covering "local crime, politics, and corruption in the Fayette County area." N.T. Summary Appeal, 4/17/23, at 65. We observe that every judge on the Fayette County bench recused as a result of this webpage, requiring a specially-seated judge from outside Fayette County to oversee Appellant's *de novo* trial. **See**, **e.g.**, Order, 2/13/23.

- 3 -

officers explained that the lot was reserved for police vehicles that had weapons in them and Appellant was not permitted to be there, he steadfastly refused to comply with the police directives. Ultimately, after several more warnings, he was arrested and charged with summary counts of disorderly conduct and harassment.

Appellant proceeded to a summary trial before a magisterial district judge, at the conclusion of which he was found guilty of disorderly conduct and not guilty of harassment. Appellant appealed to the court of common pleas for a trial *de novo*, at which the Commonwealth presented testimony from Uniontown City Police Department Captain David Rutter and PSP Corporal Michael Quinn, and played the video that Appellant recorded during the incident. Appellant testified in his defense that he was in an area he believed to be open to the public based upon his observations of the other civilians and in his capacity as an investigative journalist gathering news. At the conclusion of the hearing, the court convicted Appellant of disorderly conduct and sentenced him to pay fines and the costs of prosecution.

Appellant *pro se* filed the instant timely appeal. Upon the order of the trial court, Appellant filed a concise statement pursuant to Pa.R.A.P. 1925(b). In lieu of a Rule 1925(a) opinion, the court directed us to its reasoning offered on the record at the April 17, 2023 summary appeal hearing. Appellant presents the following issues for our consideration:

> A. Did the trial court err in convicting [Appellant] of disorderly conduct when [his] actions, as [he] was filming police activity

in a public place, did not meet the statutory requirements for disorderly conduct under Pennsylvania law?

B. Did the trial court err in convicting [Appellant] of disorderly conduct when [the court] acknowledged that [he] lacked the required *mens rea*?

C. Did the trial court err by ignoring [his] First Amendment rights by punishing [him] for exercising [his] constitutional right to record police activity in a public place?

D. Did the trial court err by failing to consider inconsistencies in the testimony of Captain Rutter, a police witness, across the preliminary hearing, the common pleas hearing, and the actual events on record[?]  This oversight permitted perjury in court.

Appellant's brief at 5 (cleaned up).

Appellant's first two issues attack the sufficiency of the evidence to sustain his disorderly conduct conviction.  We consider this challenge pursuant to the following, well-established legal principles:

A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review under a *de novo* standard. When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence.  Furthermore, the Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence.  As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. McConnell*, 244 A.3d 44, 48 (Pa.Super. 2020) (cleaned up).

- 5 -

To sustain a conviction for the subsection of disorderly conduct with which Appellant was charged, the Commonwealth had to prove, beyond a reasonable doubt, that Appellant: (1) with the "intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof" (2) "create[d] a hazardous or physically offensive condition by any act" that (3) "serve[d] no legitimate purpose[.]" 18 Pa.C.S. § 5503(a)(4). We have defined a hazardous condition as one "that involves danger or risk." *Commonwealth v. Mauz*, 122 A.3d 1039, 1042 (Pa.Super. 2015) (cleaned up). Specifically, "[t]he dangers and risks against which the disorderly conduct statute are directed are the possibility of injuries resulting from public disorders." *Id*. (cleaned up). Thus, "[t]he cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder[,]" and the "specific purpose" of criminalizing such conduct is "to preserve the public peace." *McConnell*, 244 A.3d at 49 (cleaned up).

Appellant assails each element of disorderly conduct. In particular, he argues that the Commonwealth failed to prove (1) *mens rea*, (2) that he created a hazardous or physically offensive condition, or (3) that his actions did not serve the legitimate purpose of gathering news. *See* Appellant's brief at 8-9, 11-13. In support, Appellant analogizes the facts of his case to those in *Commonwealth v. Gilbert*, 674 A.2d 284 (Pa.Super. 1996), alleging that "there is no evidence that [Appellant's] interactions with the police incited the public in any way or endangered the police." Appellant's brief at 8. Likewise, citing *Commonwealth v. Williams*, 574 A.2d 1161 (Pa.Super. 1990), he

argues that the Commonwealth cannot rely on the police response to Appellant's actions as a basis for him creating a hazardous condition. ***See*** Appellant's reply brief at 4.

At the outset, we find these cases inapposite. In ***Gilbert***, the defendant was convicted of disorderly conduct based upon making unreasonable noise pursuant to 18 Pa.C.S. § 5503(a)(2), after he "openly disagreed with a police officer who intended to tow his neighbor's truck" and refused the officer's requests to "quiet down." ***Gilbert***, 674 A.2d at 285-86. Concluding that the Commonwealth did not establish the requisite intent or that Gilbert was unreasonably noisy, we reversed. In so holding, "we emphasize[d] that the disorderly conduct statute must not be used as a catchall or dragnet for the prosecution of conduct that is uncivil, annoying[,] or irritating." ***Id***. at 287 (cleaned up). In ***Williams***, we rejected the Commonwealth's argument that the police response to a call about Williams in itself created a hazardous condition:

> The Commonwealth reasons that police vehicles speeding to the apartment building could have created traffic hazards on the roadways, and that police officers investigating the incident may not have responded as promptly to other calls. This argument proves too much. Under the Commonwealth's reasoning, any foolish act that might result in a routine call to the police, no matter how trivial or harmless the act may be, would be grounds for a criminal prosecution. We cannot uphold appellant's conviction based upon speculation concerning the indirect effects of actions taken by the police in the normal course of their duties.

***Williams***, 574 A.2d at 1164.

Unlike in those cases, the danger here was not speculative, nor was it based on the police responding to Appellant's behavior in a vacuum. Reviewing the record evidence, we must consider Appellant's conduct in the proper context, *i.e.*, during an active police investigation into a shooting where the perpetrator had not yet been apprehended. The video highlights that there were several clearly marked police vehicles in the lot and along the sidewalk running the length of the command post parking lot, as well as a battering ram, officers in uniform and in fatigues, and caution tape along portions of the side of the street where the police were operating. In other words, it was clear that the police were conducting an active investigation on one side of the street, and that bystanders were restricted to observing from the opposing sidewalk.

In the midst of this ongoing situation, but before he entered the parking lot, Appellant shouted across the street to confront an officer stationed near the command post lot about an unrelated incident.[3] After the officer retreated behind the command post truck, Appellant continued to shout at and try to film him. Nonetheless, Appellant remained on the opposing sidewalk throughout this encounter. He next filmed a battering ram vehicle being outfitted in the street in front of the command center parking lot.

_____

[3] We note with displeasure that Appellant inappropriately attached to his reply brief two protection from abuse orders that had been filed against that officer. Those orders are not only *de hors* the record, but they are also wholly irrelevant to Appellant's appeal from his disorderly conduct conviction, and we refuse to consider them.

Once the battering ram made its way towards the subject house through the alley adjacent to the command post and the shop owner is seen leaving the parking lot after having unlocked the front door, Appellant crossed the street, entered the parking lot, and attempted to question the witnesses about the shooting. He was immediately confronted by a trooper who told him to withdraw to the sidewalk because he was not permitted in the parking lot where the police cars were located. Appellant badgered the trooper about the identity of the witnesses. However, the trooper declined to provide Appellant with that information, instead continuing to direct him to vacate the parking lot and return to the sidewalk. Appellant replied, "I'm not going to respect that cause that's a violation of my first amendment." **See** N.T. Summary Appeal, 4/17/23, at 38-42 (Commonwealth Exhibit 1).

As the trooper returned to his vehicle, other officers began to approach Appellant. Undeterred, Appellant again began speaking to the witnesses, though as he did so he kept his camera pointed toward the police vehicle the trooper had entered. Within seconds, a police officer who knew Appellant by name and the officer at whom Appellant had previously shouted advised him that he needed to leave the parking lot and return to the sidewalk. As they explained this, Captain Rutter joined them, and the three law enforcement officers repeatedly told Appellant to exit the parking lot and go across the street. Appellant refused, explaining that it was "not marked" and he was a member of the press. **Id**. One of the officers directed him to where the press was located across the street and Captain Rutter explicitly told Appellant that

- 9 -

he needed to leave the parking lot because the unlocked police vehicles had weapons inside. Appellant ignored their directives, asserting "that's not a valid reason to violate my First Amendment rights." *Id*.

The officers continued to warn Appellant multiple times that he was impermissibly inside an active police scene, and explained that his refusal to vacate the parking lot would result in his arrest. Citing the Supreme Court, his rights as a member of the press, his position as a law enforcement officer, and the absence of caution tape around the parking lot, Appellant refused to leave and told the officers that if they were going to violate his civil rights, they would have to do so on camera.

At that point, one of the officers returned to patrolling the lot while Captain Rutter and the other officer remained with Appellant. As Appellant argued with Captain Rutter about whether Appellant was a law enforcement officer, the other officer attempted to walk Appellant out of the parking lot by placing his hand on Appellant's back and directing him toward the sidewalk.[4] Appellant immediately began yelling not to touch him and that they were violating his civil rights, while holding up his arms. In response, observers

_____

[4] Appellant testified at the summary appeal, "I myself am law enforcement." N.T. Summary Appeal, 4/17/23, at 85. During the video and in his brief, Appellant stated that he is a constable. This Court has "flatly rejected[ed]" the claim that "constables possess the same authorities and duties as police officers under all circumstances." *Commonwealth v. Taylor*, 677 A.2d 846, 847 n.6 (Pa.Super. 1996) (cleaned up). Rather, constables are elected officials who act as peace officers. *Id*. at 847. They do "not act for or under the control of the Commonwealth or a political subdivision." *Commonwealth v. Rodriguez*, 81 A.3d 103, 107 (Pa.Super. 2013) (cleaned up).

from across the street "began rushing up" towards the command center parking lot, "and there w[ere] even people yelling from across the street into the parking lot area over there." N.T. Summary Appeal, 4/17/23, at 58. Observing the public beginning to converge on the command center parking lot and concluding that Appellant would not voluntarily vacate the inner perimeter of the crime scene, Captain Rutter placed him under arrest and the video ended.

We reiterate that Appellant's conduct must be considered in context. Even if we were to give Appellant the benefit of the doubt that he was initially unaware that the general public was not permitted in the parking lot, he was told numerous times after his entry that he was impermissibly within an active police scene surrounded by open police vehicles with accessible weapons and that he needed to retreat to the opposite sidewalk with the other observers and members of the press.

Due to Appellant's obstinate refusal to leave, four officers had to abandon their duties, which included attempting to apprehend the shooter, assisting in the ongoing investigation, ensuring the safety of observers and the press, interviewing and safeguarding the witnesses, and ensuring the safekeeping of the vehicles and their contents in the command center parking lot, to instead deal with him. When the officers attempted to forcibly direct Appellant to the opposing sidewalk, he called the attention of other observers who began rushing towards the command center parking lot. This created a risk of additional bystanders interfering with the investigation and accessing

the weapons. Appellant's actions, which served no legitimate purpose, disturbed the public peace and could have resulted in disorder. Viewed in the light most favorable to the Commonwealth, we conclude that the testimony and video established that Appellant, with reckless disregard, created a hazardous condition by an act that served no legitimate purpose. Based on the foregoing, Appellant's sufficiency challenges warrant him no relief.

Appellant next asserts that the disorderly conduct statute, as applied to him, violates his rights to free speech and freedom of expression, guaranteed by the First Amendment of the United States Constitution. **See** Appellant's brief at 12. He maintains that the police premised his arrest upon his voicing of this constitutional violation. **Id** at 13. In so arguing, Appellant concedes that the statute is constitutional as written, but that in applying it to him in this case, it deprived him of his constitutional rights.

We consider such a claim *de novo*, with a plenary scope of review. **See Commonwealth v. Papp**, 305 A.3d 62, 70 (Pa.Super. 2023).

> A defendant may contest the constitutionality of a statute on its face or as-applied. A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. A criminal defendant may seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality.

**Id**. (cleaned up).

Appellant argues that his conduct was merely a verbal challenge to police action, and that his subsequent complaint that his First Amendment rights were being violated was the basis of his disorderly conduct conviction. *See* Appellant's brief at 13. Thus, he maintains that he was punished solely for exercising his First Amendment rights. *Id*.

As discussed at length above, Appellant was not arrested for or convicted of disorderly conduct based solely upon his statements that the police were violating his rights. Moreover, Appellant's conduct while he was in the parking lot cannot be characterized as simply a disagreement with police action. Rather, the evidence bears out that he was charged because he refused to leave the command center, a place from which he was legitimately excluded, and, by his conduct, caused a risk that others would join him in interfering with an ongoing delicate and dangerous investigation. Appellant has offered no authority to support his contention that the First Amendment permitted him to interject himself into that situation. Insofar as Appellant's speech contributed to the risk of a public disturbance, we find that he is not shielded by the First Amendment because he was permitted to exercise those rights, he just had to do so across the street. *See Commonwealth v. Bradley*, 232 A.3d 747, 754 (Pa.Super. 2020) (holding that First Amendment rights are "subject to reasonable time, place and manner restrictions" (cleaned up)). Thus, we conclude that Appellant's First Amendment rights were not violated by application of the disorderly conduct statute to him.

Finally, Appellant claims that the trial court erred in admitting Captain Rutter's testimony, which he portends to have been inconsistent, perjurious, and hearsay. *See* Appellant's brief at 14. In his two-paragraph argument, Appellant cites neither to the record to direct us to the offending testimony, nor to any legal authority in support of his averments. We have explained the ramifications of such underdevelopment thusly:

> The argument section of [Westlake's] brief is comprised of multiple assertions of error and unreasonableness by the trial court without citation to relevant legal authority. We are cognizant that [Westlake] is *pro se*, however, this Court will not act as counsel and will not develop arguments on behalf of an appellant. It is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. As such, when issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof. [Finally, a]lthough this Court is willing to construe liberally materials filed by a *pro se* litigant, a *pro se* appellant enjoys no special benefit.

*Commonwealth v. Westlake*, 295 A.3d 1281, 1286 n.8 (Pa.Super. 2023) (cleaned up). Since Appellant has failed to present any support for the allegations he raises in this section of his brief, we find the issues raised therein waived.[5]

---

[5] Appellant belatedly attempts to correct this error in his reply brief. *See* Appellant's reply brief at 16-22. However, despite including citations to the record, he still omits any legal authority. Even if we were to reach the merits of these claims, we conclude that the inconsistencies cited were readily reconcilable by the trial court, and we discern no error in the court's handling of Appellant's trial *de novo*.

*(Footnote Continued Next Page)*

Based on the foregoing, we affirm Appellant's judgment of sentence for disorderly conduct.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

4/4/2024

---

Perplexingly, Appellant also concludes this argument with new section arguing that the verdict was against the weight of the evidence, again without any legal citations. *Id*. at 22-23. Insofar as Appellant attempts to present a weight claim for the first time in his reply brief, it is waived. *See Commonwealth v. Otero*, 860 A.2d 1052, 1054 (Pa.Super. 2004).